**SAN BERNARDINO PUBLIC EMPLOY-
EES ASSOCIATION, Margaret Flynn
and Verna Carey, Plaintiffs,**

**v.**

**Dennis STOUT, Clyde Boyd, Daniel
Lough, and the County of San
Bernardino, Defendants.**

**No. EDCV 96–0136 RT (VAPx).**

United States District Court,
C.D. California,
Eastern Division.

Nov. 13, 1996.

---

Paul Crost, a Member of Reich, Adell, Crost & Cvitan, Los Angeles, CA, for Plaintiff.

Dennis J. Mahoney, MacLachlan, Burford & Arias, San Bernardino, CA, Dennis E. Wagner, Deputy County Counsel, Alan K. Marks, County Counsel, San Bernardino, CA, for Defendant.

ORDER DENYING THE MOTION OF DEFENDANTS DENNIS R. STOUT, CLYDE BOYD, AND DANIEL LOUGH TO DISMISS PLAINTIFFS' FIRST CLAIM FOR FAILURE TO STATE A CLAIM; GRANTING THE MOTION TO DISMISS PLAINTIFFS' SECOND CLAIM; DENYING THE ALTERNATIVE MOTION TO STRIKE, AND DENYING THE ALTERNATIVE MOTION FOR A MORE DEFINITE STATEMENT

TIMLIN, District Judge.

Defendants Dennis R. Stout's (Stout's), Clyde Boyd's (Boyd's) and Daniel Lough's (Lough's) (collectively defendants') motion to dismiss the complaint of San Bernardino Public Employees Association (SBPEA), Margaret Flynn (Flynn) and Verna Carey (Carey) (collectively plaintiffs) for failure to state a claim, or alternatively to strike or for a more definite statement, was submitted for decision. The court, the Honorable Robert J. Timlin, has read and considered the moving, opposing and reply papers.

Joseph Arias and Dennis Mahoney of MacLachlan, Burford & Arias appeared for defendants.

Paul Crost, Paul E. Harris III and Jennifer Orff of Reich, Adell, Crost & Cvitan appeared for plaintiffs.

The court concludes as follows:

## I.

### FACTUAL ALLEGATIONS [1]

On April 9, 1996, plaintiffs filed against defendants County of San Bernardino (County), Stout, Boyd, and Lough a complaint for injunctive and declaratory relief and for damages pursuant to 42 U.S.C. section 1983, 28 U.S.C. section 2201 and the First and Fourteenth Amendment. The complaint contains in part the following allegations:

SBPEA is a California non-profit corporation, and the recognized exclusive bargaining representative of all non-management County employees who are not peace officers, including all non-managerial employees of the Office of the District Attorney who are not peace officers.

Flynn and Carey are both currently employed as deputy district attorneys, and each has been a County employee for many years.

Stout is the elected District Attorney, and as such is the head of the department in which Flynn and Carey work.

Boyd is an assistant district attorney with the responsibility of supervising the Child Support Division (CSD) of the Office of the District Attorney.

Lough is also an assistant district attorney with the responsibility of supervising the Criminal Division of the Office of the District Attorney.

On or about September 23, 1995, a letter with the typed language "signed Child Support Division Employees" was sent to Stout, County's Board of Supervisors, the San Bernardino Sun newspaper, and SBPEA (the letter). This letter, attached

1. For purposes of this motion to dismiss, the factual allegations are deemed to be true. *Neitzke v. Williams*, 490 U.S. 319, 326–327, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989); *Grace v. Federal Emergency Management*, 889 F.Supp. 394, 396 (C.D.Cal.1995).

as Exhibit A to plaintiffs' complaint, referred to previous letters sent to Stout and to Stout's alleged failure to correct work-related situations apparently complained of in those earlier letters. The letter accused Stout of (1) mismanaging the CSD, (2) granting special dispositions on cases involving his friends and political allies with the resulting reduction of County's collections of child support arrearages by at least $250,000, (3) misappropriating federal and state funds earmarked for the CSD to the Criminal Division, (4) misusing other such funds for inappropriate purposes, and (5) condoning Boyd's alleged sexual harassment of CSD employees.

The letter also (1) accused Boyd of engaging in unspecified sexual conduct with the CSD branch manager within the view of other employees, (2) noted that it was inappropriate that Boyd had been named as the person in the CSD to whom complaints of sexual misconduct should be directed, and (3) indicated that the sender(s) of the letter had videotaped Boyd and the branch manager's alleged sexual conduct occurring "on County time and on County property."

The letter concluded by threatening (1) to release the videotape if the "cover-up" continued, (2) file a suit in federal court, and/or (3) stage lunch-time demonstrations on Hospitality Lane in the City of San Bernardino if Stout did not take action to resolve the above-described problems.

On or about October 12, 1995, Valley Wide Newspapers, the publisher of five weekly newspapers serving the mountain, desert and Apple Valley areas of San Bernardino County, published an article dealing with the allegations in the letter in each of its newspapers, a copy of which article is attached to the complaint as Exhibit B. Thereafter, the San Bernardino Sun and other newspapers published in San Bernardino County also published stories based on the allegations contained in the letter.

After the publication of these articles, Stout began an investigation ostensibly about the incidents described in the letter, but in reality to determine who had written the letter. Stout apparently believed that Flynn and Carey were the authors, and the investigation was designed to determine if they were, and, if not, who was.

On or about November 2, 1995, Stout issued a memorandum to Flynn and Carey, placing them on administrative leave for an indefinite period of time pending the outcome of "an investigation." The memoranda, copies of which are attached to the complaint as Exhibit C, stated, in relevant part:

"Pending further notice you are directed to:

"1. Remain at your house during normal work hours.

"2. Not contact, directly or indirectly, any employee of the District Attorney's Office.

"3. Neither disclose nor divulge the existence of any investigation to any person except your legal representative."

This effectively placed Flynn and Carey under "house arrest" and imposed a gag order on them which precluded them from protesting Stout's action, inquiring about the reason for the leave, or gathering any information which they could use to rebut any charges against them. This caused Flynn and Carey shock and humiliation, prevented them from communicating with their families, friends and colleagues about their sudden absence from work, and made them the subject of substantial press coverage, including statements in news stories which described them as being under "house arrest."

Flynn and Carey's humiliation, embarrassment and emotional distress were significant because the public was led to believe that they were charged with misconduct of a serious nature because administrative leave is usually a personnel action used to deal with employees suspected of gross misconduct or who present an immediate threat of harm to other employees and/or the public.

The primary purpose and effect of placing them on administrative leave and imposing a gag order was to chill their and other employees' exercise of their First Amendment rights to speak, assemble, and petition the government for redress of grievances. In addition, the gag orders also precluded Flynn and Carey from responding to allegations of

misconduct made by others and from protecting their reputation in the community. Plaintiffs allege that neither the administrative leave nor the gag orders were necessary for the achievement of any legitimate governmental objective.

In addition to placing Flynn and Carey on administrative leave and issuing the gag orders, Stout also directed and oversaw an investigation of the CSD which involved the coercive interrogation of numerous CSD employees in an attempt to discover if Flynn and Carey had written the letter and, if not, who had. Employees were threatened with discipline if they withheld information related to the identity of the letter's author or authors. When these interrogation techniques were coupled with the harsh action taken against Flynn and Carey, both of whom were respected, long-term deputy district attorneys, the effect was to instill great fear in the CSD employees and to deter them from speaking about matters of public concern, including reporting improper conduct by Stout, Boyd, and others.

Flynn and Carey were directed to return to work on November 30, 1995, at the conclusion of the investigation. On or about November 29, 1995, a letter of reprimand was issued to each of them by Lough, allegedly at the behest of Stout, accusing each of them of various acts of misconduct, and referring to specific incidents in support of such charges. A copy of the letter issued to each of them is attached to the complaint as Exhibits D and E.[2] These letters ordered them to, among other things, to "cease any derogatory ... remarks about or to, any other County employee," to "not make any inaccurate statement," to stay away from work areas other than her own assigned area except on official business, to "not engage in any gossip, rumormongering, or discussion of any personnel matter," to "not engage in any conduct that is prejudicial to good order and discipline, good morale or effectiveness of any work unit," and to "not defy authority or demonstrate the same in any manner."

The charges of misconduct contained in the letters of reprimand were false and pretextual, that Stout and Lough knew them to be false or made them with reckless disregard for their truth, and that the purpose of the reprimand was to punish Flynn and Carey and to bar them from speaking about matters of public concern which Stout, Lough, and Boyd did not want disclosed to the public or any governmental agencies, including the Board of Supervisors of the County. Although plaintiffs demanded that the letters of reprimand be withdrawn, defendants have refused to do so.

On December 4, 1995, Boyd, allegedly at the direction of Stout, issued an interoffice memorandum to all CSD employees notifying them of a new Executive Order 95–12, a copy of which is attached to the complaint as Exhibit F (Order 95–12) (Executive Order). The Executive Order provides that a violation of such order is grounds for dismissal from employment, as well as criminal prosecution, if the violation constitutes a criminal offense.[3] The Executive Order provides that employees may not release to any person not authorized to receive it for an official County business purpose "any information acquired while at work," for "(1) improper purpose; (2) any personal use, or for personal gain; or (3) any non-official business purpose," and provides that it applies to "confidential and non-confidential information."

The Executive Order also provides that "no employee of the Department is authorized to communicate with the media on matters pertaining to Division business or activities except as authorized to do so by the official spokespersons of the Division." The Summary Statement of Practical Effect accompanying the Executive Order states:

"This regulation prohibits employees from disclosing or releasing information to coworkers or others except for official business

---

**2.** Exhibit E, a copy of the letter of reprimand issued to Carey, appears to be missing one or two pages.

**3.** Boyd's interoffice memorandum quoted paragraph (c), section 3, County Rule X to the effect that a violation of the Executive Order is of sufficient gravity that any single act or omission, depending on the circumstances, will be subject to disciplinary action including termination of employment without further warning or progressive forms of discipline.

purposes; prohibits press statements except as provided herein; deems confidential specified materials; prohibits disclosure of Division operating procedures, records and materials without permission; prohibits false or misleading statements to the public and press and provides notice of penalties for the violation hereof."

The Executive Order applies to "(1) all employees of the Child Support Division (including temporary help); and (2) other employees of the District Attorney's Office who have access to, or who obtain, materials, records or information from or about the Child Support Division."

The Executive Order is in keeping with County's policy of deterring employees from speaking to the public or the elected members of the Board of Supervisors about matters of public concern related to or arising out of the workplace, and that through its department managers, County has engaged in a pattern and practice of coercing employees into remaining silent about such matters, and of prohibiting the flow of information from employees to the Board of Supervisors, the media, and the public.

Additionally, Flynn and Carey have been subjected to various acts of petty and unwarranted retaliation by the individual defendants, designed to create such an intolerable working condition that they will resign.

## II.

### ANALYSIS

#### A. The Motion to Dismiss for Failure to State a Claim

##### 1. SBPEA Has Standing

■ Defendants first contend that SBPEA, which is only implicated as a plaintiff in the first claim for relief, has no standing to prosecute this action because it does not allege that its members are adversely affected by any act or omission of defendants or any of them, that it has not alleged that the Executive Order has had an adverse

effect on its members, and that its seeks only to rescind the letters of reprimand to Flynn and Carey and for damages payable to those plaintiffs only.

Defendants' argument is based entirely on their misreading the complaint.[4] The complaint alleges that the Executive Order is, "on its face, ... an unconstitutional restraint on the right of CSD employees to speak on matters of public concern" because "[it] bars CSD employees from speaking about such matters as political influence being used by the District Attorney to unlawfully impede prosecutions, employee morale and its effect on the operations of the CSD, sexual harassment of female employees, discriminatory working conditions, and retaliation against employees for their union activity or for having engaged in constitutionally protected speech." (Complaint, ¶ 22.)

The complaint further alleges that the issuance of the Executive Order, in conjunction with the "house arrest" of, and "gag orders" and letters of reprimand issued to, Flynn and Carey, constituted "a deliberate effort by the individual defendants to coerce into silence" not only Flynn and Carey, but other non-managerial employees of the District Attorney's Office, and to restrain such persons from publishing the kind of material which is the subject of the letter or which would otherwise be critical of the District Attorney and his assistant district attorneys. (Complaint, ¶ 24.)

Finally, the complaint seeks a declaration that County employees cannot be disciplined for speech about matters of public concern which relate to their employment and that the Executive Order violates the First Amendment. It further prays for (1) an order directing County and the individual defendants to rescind not only the letters of reprimand but the Executive Order as well, (2) an injunction to restrain all defendants and their agents from disciplining or harassing County employees for communicating with the Board of Supervisors, their fellow

---

4. The complaint also alleges that SBPEA is the exclusive bargaining representative of all non-managerial employees of the offices of the District Attorney, who are not peace officers. It is reasonably inferable from the allegation of the complaint that Flynn and Carey are and were members of SBPEA during all pertinent time periods alleged in the complaint and that they are not peace officers.

employees, the media and the public about matters of public concern which relate to their employment, and (3) an order requiring Stout and every other County department manager to notify employees that they have the right to communicate with the Board of Supervisors, their fellow employees, the media and the public about matters of public concern which relate to their employment without fear of reprisal or retaliation. (Complaint, prayer, at 19.)

 As defendants themselves note, an organization has standing to sue on behalf of its members if (a) the members would themselves have standing to sue in their own right; (b) the interests the organization seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *U.S. v. City and County of San Francisco*, 979 F.2d 169, 171 (9th Cir.1992).

Here, all these elements exist: (a) individual County employees would have standing to sue for violation of their First Amendment rights based on allegations that the Executive Order is, on its face, unconstitutional; (b) those alleged rights of SBPEA members which it seeks to protect, i.e., the right to speak about certain matters related to the operation of the public agency where they work, as well as about such working conditions as sexual harassment, employment discrimination, and retaliation for engaging in union activities, are clearly germane to its purpose as the recognized bargaining representative of such members; and (c) the claim asserted—violation of SBPEA's members' freedom of speech—and the relief requested—injunctive and declaratory relief, rather than damages—does not require the participation of individual members.

Defendants, however, contend that SBPEA's membership does not have an "unambiguous interest" in obtaining an order striking down a County policy against "gossiping, rumormongering, and public discussion of personnel matters" (Motion at 5), and that therefore, pursuant to the holding in

*U.S. v. City and County of San Francisco*, 979 F.2d 169, 171, *supra*, SBPEA has no standing and should be dismissed as a plaintiff. More specifically, defendants assert that "[t]he union membership includes both gossipers and rumormongers and the objects of gossip and rumormongering; while some union members might 'benefit' from being free to gossip and rumormonger about their coworkers, other union members would suffer from their co-workers' doing so." (Motion at 5.)[5]

Defendants misread the holding in *U.S. v. City and County of San Francisco*, 979 F.2d 169, *supra* (*City of San Francisco I* ). In *City of San Francisco I*, the City of San Francisco (City) was subject to a consent decree related to claims of racial and sexual discrimination and harassment at the San Francisco Fire Department. *See Davis v. City and County of San Francisco*, 890 F.2d 1438, 1441–1442 (9th Cir.1989) (*City of San Francisco II* ). The consent decree had been obtained via a settlement in *Western Addition Community Org. [WACO] v. Alioto* No. C–70–1335 WTS, slip op. at 9–10 (N.D.Cal. May 18, 1977) (*WACO* ) by plaintiffs consisting of a number of individuals and two organizations, Chinese for Affirmative Action and the Mexican American Legal Defense Fund. 890 F.2d at 1443.

The San Francisco Firefighters Local No. 798 (Union) was not a party to the *WACO* litigation. In *City of San Francisco I*, Union challenged the consent decree as fundamentally unfair in violation of Federal Rules of Civil Procedure, Rule 23(e), and as violative of the equal protection provisions of the Fourteenth Amendment and Title VII. It also challenged the district court's denial of its motion to enjoin City from using a new method to assign seniority to firefighters promoted pursuant to the terms of the consent decree. The Union was unsuccessful on all fronts.

In *City of San Francisco II* (the case cited by defendants), in connection with its obligations under the consent decree, City filed a

---

**5.** Defendants' argument ignores the fact that the Executive Order does not refer to gossip or rumormongering. It prohibits almost **all** speech related to work (section 8 of the Executive Order) and discussion of personnel matters (section 5(2) of the Executive Order).

motion with the district court requesting a declaration that it could promote 12 candidates to the position of captain pursuant to a procedure known as banding, which procedure uses an affirmative action component in making promotion decisions between candidates whose test scores fall within a statistically-derived band or range. Under a tentative report by the monitor overseeing the consent decree, City had been ordered to promote only minority candidates to the rank of captain, but the candidates City proposed to promote consisted of 7 minority candidates and 5 non-minority candidates. 979 F.2d at 170. The *WACO* plaintiffs threatened to bring a motion for contempt if City promoted any candidates other than minority candidates, while the 15 highest scoring non-minority candidates moved for, and were granted intervention. The district court granted City's motion to promote pursuant to the banding procedure, and Union appealed the order approving the promotion plan. It is not clear from the opinion what remedy/relief Union sought via its appeal.

On appeal, both the defendant City and one of the *WACO* plaintiffs contended that Union lacked standing to bring the appeal, because none of its members had suffered an injury in fact which was likely to be redressed by a favorable decision on appeal, which in turn meant that none of Union's members would themselves have had standing to sue in their own right, which, again in turn, meant that Union could not satisfy the first prong of the test for organizational standing. Although the 15 highest scoring non-minority candidates had individual standing, the court concluded and Union conceded that once such members had separate representation, Union could not derive standing from their interests. The court added that "[t]he likelihood that the interests of the 15 non-minority fire fighters diverge from those of the other members of the Union counsels against treating the Union as representing their interests for the purpose of establishing standing to sue." 979 F.2d at 171.

The opinion in that case says nothing about ambiguous or unambiguous interests. Instead, the case turned on very specific facts: that the employees' employer was subject to a consent decree which involved applying affirmative action considerations in the promotion of employees, for the purpose of remedying a past pattern of racial and gender discrimination and harassment in the San Francisco Fire Department; that the consent decree had been obtained through the litigation efforts of minority and women members of the firefighter's union (Union), not by Union, that thereafter, in the course of performing under the consent decree, the employer's actions were challenged by non-minority union members who had obtained their own legal counsel and had instituted suit on their own behalf.

Thus, in *City of San Francisco II*, there was a **direct** conflict between the interests of two different factions of Union's membership: promotions received by members of one group came at the cost of loss of such promotions to members of the other group. Furthermore, each group of members had their own legal counsel, so, for all practical purposes, there was no interest left to be represented by Union suing on behalf of either group.

In contrast, here there is no evidence of any actual conflicting factions among SBPEA's membership, or those non-member employees whom they represent and particularly non-managerial employees of the District Attorney's Office, nor any showing that such factions have obtained separate representation. More to the point, even if such factions exist, there is no analogous direct conflict between the interests of the possible factions on this issue. In *City of San Francisco II*, there was a limited group resource—openings for promotion—for which Union's members were in competition. Here, each SBPEA's members' right to engage in protected speech is a resource unique to that individual member, the use of which resource does not deprive any member of his or her own right to speak or to refrain from speaking. Therefore, defendants' motion to dismiss SBPEA as a plaintiff on the ground that it lacks standing is denied.

### 2. *Flynn Has Standing to Challenge the Policy*

■ Defendants contend Flynn lacks standing because (1) it appears, from Exhibit

G to the complaint,[6] that she is no longer an employee of CSD, (2) she has not alleged that she is a person who obtains materials from or about that division, and (3) therefore, she has not alleged that she is subject to the challenged policy or that any interest of hers is jeopardized by the policy.

There are three problems with this argument. First, Flynn is employed by the District Attorney's Office, not by a particular division of that office.

Second, it is inferable that a deputy district attorney assigned to the Welfare Fraud Unit may well have work-related reasons to obtain records and/or other information from the Child Support Division of the Office of the District Attorney. In reviewing a motion to dismiss for failure to allege sufficient facts to state a claim, the court will accept as true all reasonable inferences to be drawn from the alleged facts. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986).

Third, Flynn had been assigned to the CSD, and presumably while serving there she obtained information which would be covered by the prohibitions set forth in the Executive Order. The Executive Order does not exclude from its ambit the dissemination of materials obtained before issuance of the Executive Order. So presumably Flynn is still at risk if she should violate the Executive Order by publishing such information previously obtained by her.

Because Flynn's First Amendment rights allegedly are impinged upon by the Executive Order, she has standing to challenge it, and defendants' motion to dismiss her first claim on this ground is denied.

### 3. *Plaintiffs Have Stated a Claim for Deprivation of First Amendment Rights*

Defendants' argument raises seven points in support of their contention that the complaint fails to allege facts sufficient to state a claim for deprivation of plaintiffs' First Amendment rights. None of these points has any merit, and the complaint alleges facts sufficient to state a claim for violation of the First Amendment rights of Flynn, Carey, and those members of SBPEA affected by the Executive Order, as explained below.

■ Defendants first contend that "[i]f it appears on the face of the exhibits [attached to plaintiffs' complaint] that [such exhibits] work no First Amendment deprivation, then plaintiffs have failed to state a claim upon which relief may be granted." However, the Executive Order, as alleged in the complaint, appears facially to constitute an impermissible prohibition on protected speech, i.e., speech on matters of public importance, as well as speech by Flynn, Carey, and all "other employees of the District Attorney's Office who have access to, or who obtain, materials, records or information from or about the Child Support Division" which is directed to such employees' elected representatives.

■ Defendants next contend that plaintiffs do not allege that they were punished for anything that they said or were believed to have said. (Motion at 7.) However, the complaint does allege that Flynn and Carey were placed on administrative leave, reprimanded, and then subjected to harassment both because the individual defendants **believed** that they were the authors of the letter and to instill fear in other employees and thereby chill further speech by others.

■ Defendants also argue that plaintiffs merely allege that the letters of reprimand and the Executive Order may someday prevent them from saying something they might want to say. However, when a governmental regulation seeks to prohibit such a broad range of protected conduct that it *may* inhibit constitutionally protected speech, it is subject to facial challenge. *Ward v. Rock Against Racism,* 491 U.S. 781, 793–794, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989); *Members of City Council v. Taxpayers for*

---

**6.** Exhibit G is a memorandum to "Margaret Flynn, DDA/Welfare Fraud Unit" from "Dennis Stout/District Attorney" which states: "It has come to my attention that on October 31, 1995 and November 1, 1995, you parked your 1987 Chevrolet Van, California license 2GFE303, in a parking spot assigned to attorney staff for the District Attorney's Child Support Division. ¶ This is your official notification prohibiting you from utilizing those parking spaces designated for Child Support staff. ¶ Future violations of this order will be handled through appropriate disciplinary action."

*Vincent,* 466 U.S. 789, 796–802, 104 S.Ct. 2118, 2124–2127, 80 L.Ed.2d 772 (1984); *Fireman's Fund Ins. Co. v. Quackenbush,* 87 F.3d 290, 296 (9th Cir.1996).

■ Defendants next argue that plaintiffs do not admit they were the source of the anonymous letter. However, plaintiffs need not admit that they authored the letter to be entitled to claim that their First Amendment rights were violated. If, as plaintiffs allege, Flynn and Carey were reprimanded because they were believed to have authored the letter, rather than because of the allegedly pretextual reasons stated in the letters of reprimand, and if the contents of that letter were protected by the First Amendment, then defendants would be liable for violating Flynn and Carey's First Amendment rights, even if they were not in fact the authors. "If an employment action is based on what an employee *supposedly* said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected [by the First Amendment], the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should, however, be the case that a reasonable manager would use before making an employment decision—discharge, suspension, *reprimand,* or whatever else—of the sort involved in the particular case. Justice Scalia correctly points out that such care is normally not constitutionally required unless the employee has a protected property interest in her job, *post,* at ——, 114 S.Ct. at 1894; *see also Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2710, 33 L.Ed.2d 548 (1972); but we believe that the possibility of inadvertently punishing someone for exercising her First Amendment rights makes such care necessary." *Waters v. Churchill,* 511 U.S. 661, ——, 114 S.Ct. 1878, 1889, 128 L.Ed.2d 686 (1994), emphasis added.

■ Defendants also argue that none of the violations mentioned in the letters of reprimand implicates any privileged communication or petition for redress. But this is irrelevant. Defendants' issuance of the letters of reprimand containing allegedly false and pretextual charges against Flynn and Carey obviously is pled for other reasons: to show (1) the course of conduct undertaken by defendants to chill future protected speech by plaintiffs by instilling a fear of reprisal including termination of employment, (2) that Flynn and Carey were punished because defendants believed Flynn and Carey had engaged in certain speech, which in fact is constitutionally protected and (3) that defendants' conduct involved malice and/or oppression.

■ Defendants next argue that plaintiffs offer only "vague generalities about the kinds of statements [they] might want to make in the future or might be deterred from making by either the letters of reprimand or [the Executive Order]." The complaint, however, alleges much more. It alleges that defendants' conduct was designed to deter future speech on such matters as "political influence being used by the District Attorney to unlawfully impede prosecutions, employee morale and its effect on the operations of the CSD, sexual harassment of female employees, discriminatory working conditions, and retaliation against employees for their union activity or for having engaged in constitutionally protected speech." (Complaint, ¶ 22.)

■ Finally, defendants assert that each of the prohibitions imposed by either the letters of reprimand or the Executive Order is a prohibition which County, as plaintiffs' employer, was and is entitled to impose. (Motion, 8.) Plaintiffs clearly and sufficiently allege that the Executive Order, on its face, imposes certain prohibitions which County, as plaintiffs' employer, and defendants, as authorized representatives of the County, are not entitled to impose. The law is clear that, although the government, as an employer, has an interest in promoting the efficiency of the public services it performs, and may use such interest to justify imposing restraints on employees' speech which would be unconstitutional if applied to the public at large, nonetheless it has no absolute right to prohibit speech, and its interest in efficiency in the workplace must be balanced against both the interests of the employees, as citizens, to comment upon matters of public concern,

*U.S. v. National Treasury Employees Union*, 513 U.S. 454, ——, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964, 978 (1995), and the interests the public may have in reading and hearing the public employees' comments. 513 U.S. at ——, 115 S.Ct. at 1015.[7] Because the process of weighing competing interests generally requires consideration of facts, and the facts of this case have yet to be adjudicated, the court refrains from deciding, as a matter of law in ruling on the instant motion, that the Executive Order facially contains prohibitions which are unconstitutional.

The court, however, does note that, by its terms, the Executive Order on its face reveals no effort by defendants to strike a balance between the District Attorney's Office's interest in efficiency and the employees' and public's competing First Amendment interests. In part it prevents all CSD employees, as well as all "other employees of the District Attorney's Office who have access to, or who obtain, materials, records or information from or about the Child Support Division," from releasing to anyone "who is not authorized to receive the same for an official, County business purpose" a range of material so broadly described as to include **any** information acquired while at work, whether confidential or non-confidential, and to prohibit all CSD employees from communicating with the media "on matters pertaining to Division business or activities except as authorized to do so by the official spokespersons of the Division."

The Executive Order thus does not exempt from its reach (1) speech involving matters of public concern regardless of whether such speech is, in fact, likely to be disruptive to the government's mission as an employer, *see, e.g., Waters v. Churchill,* 511 U.S. 661, ——, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686, *supra,* (2) speech which the government, as

an employer, has absolutely no legitimate reason to restrict[8], and (3) speech from employees to their union representatives about such working conditions as racial and sexual harassment and harassment for exercising protected constitutional rights.

Therefore, defendants' motion to dismiss plaintiffs' first claim for failure to state a claim for violation of plaintiffs' First Amendment rights is denied.

**4. *Plaintiffs Concede that Their Second Claim, for Denial of Their Liberty Interest, Should Be Dismissed***

Defendants contend that plaintiffs Flynn and Carey have failed to state a substantive due process claim in their second claim. Plaintiffs concede that this is so, and do not suggest that amendment would cure the problem with their second claim. Therefore, defendants' motion to dismiss the second claim for failure to state facts sufficient to state a claim is granted.

**5. *The Complaint Meets the Heightened Pleading Standard of Branch v. Tunnell***

▆▆▆▆ Defendants also have requested that plaintiffs' claims should be dismissed because they have not met the "heightened pleading standard" required of complaints against public officials sued in their individual capacities who would be entitled to assert the defense of qualified immunity, citing *Branch v. Tunnell,* 14 F.3d 449 (9th Cir. 1994); *Branch v. Tunnell,* 937 F.2d 1382 (9th Cir.1991). Under this heightened pleading standard, a plaintiff must plead more than bare allegations of improper purpose, i.e., a plaintiff must plead facts which are specific and concrete enough to enable the defendant to prepare a response and, if appropriate, a

---

7. Public employees often are in the best position to know whether the public's trust is being violated by the agencies charged with serving them, and "public debate may gain much from their informed opinions. [Citation.]" *Waters v. Churchill,* 511 U.S. 661, ——, 114 S.Ct. 1878, 1887, 128 L.Ed.2d 686, *supra.* In addition, a public employee, "like any citizen, may have a strong, legitimate interest in speaking out on public matters. In many such situations, the government may have to make a strong showing that the speech is, in fact, disruptive before it

may be punished. [Citations.]" 511 U.S. at ——, 114 S.Ct. at 1887.

8. For example, "information acquired while at work" could include otherwise public, non-confidential information about the contents of new state or federal guidelines related to child support, which, under the Executive Order, a CSD employee would be forbidden from sharing with a relative or friend.

motion for summary judgment based on the defense of qualified immunity.

Defendants fail to point out in what regard plaintiffs' complaint is deficient, but merely assert in conclusory terms that it does not meet this heightened pleading standard. Not so. The complaint contains specific and concrete allegations of fact related to defendants' subjective intent in undertaking the acts complained of, which allege that such conduct was motivated by defendants' alleged desire to keep plaintiffs Flynn and Carey, as well as other employees under defendants' control, from disseminating to anyone at all, including the public, the media, and the Board of Supervisors, information related to the operation of the CSD, including information related to certain defendants' allegedly poor management skills, financial improprieties, and inappropriate sexual conduct at work.

Therefore, defendants are not entitled to have plaintiffs' complaint dismissed on the ground it does not meet the heightened pleading standard.

### B. *The Motion to Strike*

The defendants request that SBPEA be stricken as a plaintiff, that the prayer for punitive damages be stricken, that "scandalous" matter concerning plaintiffs' coworkers be stricken, and that the phrase "house arrest" be stricken.

#### 1. *SBPEA Should Not Be Stricken as a Plaintiff*

As discussed above, SBPEA has standing and is a proper party plaintiff, so there is no legal reason to strike it as a plaintiff.

#### 2. *The Prayer for Punitive Damages Should Not Be Stricken*

■ Defendants contend that they were sued in their representative capacities rather than as individuals. Not so. The complaint alleges that each individual defendant was acting under color of law in committing the acts which allegedly deprived plaintiffs of their constitutional rights, and seeks punitive damages from the individual defendants only. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 165–166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he [or she] takes under color of state law"); *see also Shoshone–Bannock Tribes v. Fish Game Com'n, Idaho,* 42 F.3d 1278, 1284 (9th Cir.1994) (when state officials are sued for damages under 42 U.S.C. section 1983 it is presumed they are sued in their individual capacity, because a claim for damages against a state official in an official capacity is barred by the Eleventh Amendment).

■ Defendants also seek to strike the prayer for punitive damages on the ground that plaintiffs have not pled with sufficient particularity facts to support their claim for punitive damages. However, plaintiffs' complaint alleges specific conduct which, if found to be true, could support a finding that the individual defendants acted toward Flynn and Carey with malice and/or oppression, e.g., that they (1) placed in Flynn and Carey's personnel files letters of reprimand containing false statements for the purpose of punishing them because they believed they were the authors of the letter, (2) engaged in various acts of harassment and retaliation, and (3) did so with the intent to cause plaintiffs to leave their employment, all for two reasons: (a) to punish Flynn and Carey because they believed Flynn and Carey had exercised their constitutionally protected right to speak on certain matters, and (b) to chill the further exercise of Flynn's, Carey's, and other employees' constitutionally protected right to speak on certain matters.

#### 3. *The Allegedly "Scandalous" Allegations Concerning Plaintiffs' Co-Workers Should Not Be Stricken*

■ Defendants contend that there is no reason, other than the prurient interest that might be stirred in certain representatives of the media, to include in the complaint allegations concerning the "sex lives of the plaintiffs' co-workers." They contend that such allegations, as well as the letter attached as Exhibit A to the complaint, should be stricken as simultaneously immaterial, impertinent and scandalous.

The allegations of the complaint do not refer to plaintiffs' co-workers' "sex lives."

Instead, the allegations of the complaint and those portions of Exhibit A which mention sexual matters refer to (1) unspecified, apparently consensual sexual conduct committed by plaintiffs' supervisor and an office manager at work, during work hours, in a place open to public view; (2) employment-related favorable treatment in exchange for sexual favors; (3) apparently unwelcome sexual harassment of plaintiffs' coworkers by plaintiffs' supervisor, who is also the affirmative action officer to whom complaints about such harassment are to be made; and (4) the District Attorney's alleged failure to take any action to remedy the above noted matters despite complaints to him by employees of the CSD.

Such allegations are not references to plaintiffs' co-workers' "sex lives," a term which generally implies matters related to **private** sexual relationships and conduct, as opposed to sexual relationships and conduct carried on in public between and among public employees, nor are such allegations immaterial. Instead, they have a bearing on the issue of whether the speech in question is protected because such allegations relate to a matter of public concern. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on another ground, Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). The allegations are not impertinent, i.e., they are relevant to issues involved in the action, and evidence as to them could be admitted in the action. *Id.* They are not scandalous, i.e., they do not cast a "cruelly" derogatory light on a party or other person. *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 665 (7th Cir. 1992).

█ Furthermore, a motion to strike should not be granted unless it is clear that the matter to be stricken can have no possible bearing on the subject matter of the litigation, and is particularly disfavored with respect to class allegations in employment discrimination suits. *Naton v. Bank of California*, 72 F.R.D. 550, 551 n. 4 (N.D.Cal. 1976). As noted above, the nonspecific allegations of sexual misconduct in plaintiffs' workplace has a bearing on whether their speech was on a matter of public concern and

hence protected. And, although such allegations are not made in connection with describing a class in an employment discrimination suit, they are made in an analogous situation, i.e., in connection with describing workplace conditions involving favoritism, sexual harassment, and other misconduct.

Therefore, defendants' motion to strike the allegations of sexual conduct at work and to strike Exhibit A is denied.

### 4. The Use of the Term "House Arrest" Need Not Be Stricken

█ The individual defendants contend that the phrase "house arrest" should be stricken from plaintiffs' complaint because it is a legal term of art which plaintiffs are using improperly. Defendants argue that "house arrest" means post-conviction confinement or pre-trial detention relating to a federal crime.

According to the court's research, "house arrest" is not a legal term of art. For example, it is sometimes used to describe: (1) a form of confinement imposed after conviction, *see U.S. v. Frank*, 36 F.3d 898, 899 (9th Cir.1994) and *U.S. v. Cutler*, 58 F.3d 825, 838–840 (2d Cir.1995); (2) a form of pre-trial confinement for those under indictment for a crime, *see* Davan Maharaj, *Alleged Baby Sellers Deny Tax Charges*, L.A. Times, July 30, 1996 at B2 (1996 WL 11253871); (3) a form of post-conviction, pre-sentence confinement, *People v. LaPaille*, 15 Cal.App.4th 1159, 19 Cal.Rptr.2d 390 (1993); (4) the juvenile law equivalent of release on one's own recognizance, *In re Jovan B.*, 6 Cal.4th 801, 25 Cal.Rptr.2d 428, 863 P.2d 673 (1993); (5) a method used by repressive political regimes to silence charismatic political dissidents, such as Aung San Suu Kyi of Burma, by cutting off public contact with them, *see* Michael Hirsh, *Making It in Mandalay*, Newsweek, June 19, 1995 at 46 (1995 WL 14497057); (6) a method used by repressive religious regimes to silence persons with disfavored scientific beliefs, such as Christopher Columbus, by cutting off public contact with them, *see* Fenner, *The Daubert Handbook: The Case, Its Essential Dilemma, and Its Progeny*, 29 Creighton L.Rev. 939, 953 (1996); and (7) the constructive effect of juvenile curfew laws on juveniles, Trollinger,

*The Juvenile Curfew: Unconstitutional Imprisonment,* 4 Wm. & Mary Bill of Rights Journal 949, 993 (1996).

Furthermore, "house arrest" is defined as "detention in one's own house etc., not in prison." 1 *The New Shorter Oxford English Dictionary* (Clarendon Press 1993) "house" at p. 1270, col. b. "Detention" is defined as "The action of arresting *or confining,* the state of imprisonment *or confinement,* now *esp.* of a military or *political offender* .... At schools: *keeping in as a punishment;* an instance of this." *Id.* at p. 650, col. c, emphasis added. Thus, the use of this phrase to describe action by a person or entity other than a law enforcement officer, judge or a penal institution, despite the fact that it incorporates the word "arrest," is no more misleading than is use of the phrase "false imprisonment" to describe confinement in places other than an actual prison by persons other than official jailers.[9]

The court therefore concludes that the term "house arrest," particularly as used in the context of the yet-to-be-proved allegations of this complaint, is simply a shorthand way of referring to the alleged fact that plaintiffs were restricted to their homes during normal work hours as a form of punishment by defendants because of defendants' belief that they were the authors of a letter related to local political issues, the existence and/or substance of which letter apparently offended the individual defendants. The use of the term is neither impertinent nor scandalous within the meaning of Federal Rules of Civil Procedure, Rule 12(f). Further, defendants do not contend that striking this phrase would make the trial less complicated or otherwise streamline ultimate resolution of the action. *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir.1993). Therefore, the motion to strike the phrase from the complaint is denied.

### C. *The Motion for a More Definite Statement*

■ Defendants also contend that plaintiffs have not met the heightened pleading standard required pursuant to *Branch v. Tunnell,* 14 F.3d 449 (9th Cir.1994), i.e., that the allegations of fact are not specific and concrete enough to enable them to prepare a response, and, if appropriate, a motion for summary judgment based on qualified immunity.

■ Defendants misunderstand the purpose of a motion for a more definite statement. A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her. *See Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F.Supp. 940, 949 (E.D.Cal.1981). The complaint here is not unintelligible or vague, and it is specific enough to apprise defendants of the substance of plaintiffs' claims against them. Therefore, the motion for a more definite statement is denied.

### III.

### *DISPOSITION*

IT IS ORDERED THAT:

(1) defendants' motion to dismiss is GRANTED only as to plaintiffs' second claim, and plaintiffs' second claim is dismissed with prejudice;

(2) defendants' motion to dismiss the first claim is DENIED;

(3) defendants' motion to strike is DENIED in its entirety; and

(4) defendants' motion for a more definite statement is DENIED in its entirety.

---

9. In fact, the advertisements for a movie released this summer entitled "House Arrest" describes the plot as "Kids Lock Up Parents."