**CITY OF KOKOMO, Indiana, Appellant–Defendant,**

v.

**Scott KERN, Appellee–Plaintiff.**

No. 34A04–0512–CV–726.

Court of Appeals of Indiana.

Aug. 17, 2006.

Andrew P. Wirick, Indianapolis, IN, Attorney for Appellant.

John F. Kautzman, M. Elizabeth Bemis, Ruckelshaus, Roland, Kautzman Blackwell & Hasbrook, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant City of Kokomo appeals a judgment reversing the decision of the Kokomo Board of Public Works and Safety ("the Board") to demote Appellee–Plaintiff Scott Kern ("Kern") from his position as a captain of the Kokomo Fire Department ("the Fire Department") to that of firefighter because of public statements made by Kern. We reverse.[1]

### Issue

The City of Kokomo presents two issues for review, which we consolidate and restate as the following issue: whether the trial court erroneously found that the Board's decision to demote Kern constituted a violation of his First Amendment right to free speech.

### Facts and Procedural History

In 1989, the Fire Department hired Kern as a firefighter. In 1996, Kern was promoted to the rank of captain.[2] In 2004, Kern was living in the Willowridge subdivision of Kokomo. For several years, Willowridge residents had organized and presented Fourth of July fireworks displays for the neighborhood.

During June of 2004, Kokomo Fire Chief David Duncan ("Chief Duncan") received an anonymous complaint that Willowridge residents had set up donation boxes to obtain contributions for a July 2004 fireworks display. Chief Duncan contacted Kern and advised Kern that a fireworks permit would be necessary, pursuant to Indiana Code Section 22–11–14–2.[3] Kern responded that he would contact the community members involved in organizing the fireworks display. Several days later, Chief Duncan received a copy of a flyer soliciting donations for a Fourth of July fireworks display to be held at Wil-

---

1. Oral argument was conducted on July 18, 2006, in the Indiana Court of Appeals courtroom. We thank counsel for their advocacy.

2. Kern received one interim promotion, also in 1996.

3. Indiana Code Section 22–11–14–2 provides in pertinent part:
 (a) The fire prevention and building safety commission may:
 (1) adopt rules under IC 4–22–2 for the granting of permits for supervised public displays of fireworks by municipalities, fair associations, amusement parks, and other organizations or groups of individuals; and

 (2) establish by rule the fee for the permit, which shall be paid into the fire and building services fund created under IC 22–12–6–1.
 (b) The application for a permit required under subsection (a) must:
 (1) name a competent operator who is to officiate at the display;
 (2) set forth a brief resume of the operator's experience;
 (3) be made in writing; and
 (4) be received with the applicable fee by the office of the state fire marshal at least five (5) business days before the display.

lowridge. Kern was listed as one of the contact persons. Chief Duncan mailed certified letters to each of the named individuals, including Kern, advising them that conducting a fireworks display without a permit would be a violation of law.

Ron Herrell ("Herrell"), a retired Fire Department inspector and then an Indiana State Representative, volunteered to investigate. He then contacted the State Fire Marshall, who ostensibly advised that a permit should be obtained for a fireworks display using large fireworks, but that it was possible to obtain an expedited permit, and that "[the Chief] better have a reason to deny it." (App.105.) Herrell contacted Chief Duncan to discuss the situation. Chief Duncan indicated that he did not know that he would make an exception for a fireman by granting an expedited permit and that he "didn't owe Kern any favors" because Kern had opposed Pat Donohue in the primary election for mayor. (App. 106.)

Kern obtained an application for a fireworks permit from the State Fire Marshal's office and brought the partially completed application to a June 30, 2004 meeting with Chief Duncan. The permit application listed Kern's name, telephone number, address, and signature. It also included an aerial photograph of the Willowridge subdivision, indicating the drop zone and area from which the fireworks would be launched. The application did not list the name of the fireworks shooter, nor did it include a listing of fireworks sizes and types or a Certificate of Insurance. Kern and Chief Duncan discussed, but did not resolve, the issue of whether Kern's homeowner's policy served as adequate insurance because the fireworks would be launched from his property. Chief Duncan advised Kern that he would not approve an incomplete permit application.

The planned fireworks display was cancelled. Subsequently, the *Kokomo Tribune* and the *Kokomo Perspective* published articles about the cancellation. In an article published by the *Kokomo Tribune,* Kern was quoted as saying, "I don't mind if someone has a personal vendetta against me. I don't mind confrontation. But I do mind when it hurts the people of the neighborhood. I think the city is abusing its power." (App.116.) The same article included Chief Duncan's denial that Kern submitted the proper documents to obtain a fireworks permit.

On July 7, 2004, in an article published by the *Kokomo Perspective,* Kern admitted, "We never got licensed." (App.118.) The Perspective further quoted Kern as saying, "We completed the rest of the process, and the state fire marshal told us there was no reason why our permit couldn't be signed. But the Chief dragged his feet." (App.118.) On July 11, 2004, the *Kokomo Tribune* published a letter signed by Kern and two other members of the "Fireworks Committee." In part, the letter provides,

> It would be nice if they took as much interest in getting their equipment in better working order instead of wasting taxpayer dollars and spending so much time trying to shut down our fireworks show. We would like to think that this has no political strings attached to it, but I think we would be sadly mistaken if we thought that way.... I guess that's what we get for our tax dollar. Living in perhaps the highest tax rate zone in the city is an old run-down fire truck for our so-called fire protection and a side of harassment from the fire department for good measure.

(App.119.)

On August 9, 2004, Chief Duncan filed a professional standards complaint initiation form against Kern, alleging violations of

the Fire Department Rules and Regulations. On November 20, 2004, the Kokomo Fire Department Board of Chiefs convened, reviewed written documents, and recommended that Kern receive a written reprimand and time off.

On February 28, 2005, Chief Duncan presented charges against Kern to the Board, alleging violations of Fire Department Rules and Regulations Article 3.01 (Conduct Unbecoming an Officer) and Article 5.09 (Failure to Keep Supervisors Informed).[4] Kern timely requested a hearing, and hearings were conducted on March 28 and April 1, 2005. Chief Duncan requested that Kern be demoted from Captain to firefighter, receive a thirty-day suspension, and be prohibited from Fire Department property during the suspension.

On June 20, 2005, the Board issued its Findings of Fact, Conclusions of Law, and Final Determination, finding that Kern violated Article 3.01 (Conduct Unbecoming an Officer) but that there was insufficient evidence that Kern violated Article 5.09 (Failure to Keep Supervisors Informed). In pertinent part, the Board found: "Captain Kern brought the Department into disrepute, misled the public and residents of his neighborhood as to the reasons for the denial of the permit application, and undermined the public's confidence in the Department." (App.29.) Kern was demoted to the rank of firefighter.

On July 15, 2005, Kern filed a Verified Petition for Judicial Review in the Howard Circuit Court. Oral argument was heard on October 6, 2005. On December 7, 2005, the trial court entered its Findings of Fact, Conclusions of Law, and Order finding that the Board decision was contrary to law, and ordering Kern's reinstatement as a Captain. This appeal ensued.

**Discussion and Decision**

*A. Standard of Review*

 Judicial review of an administrative determination is limited to determining whether the administration possessed jurisdiction of the subject matter, whether the administrative decision was made pursuant to proper procedures, was based upon substantial evidence, was not arbitrary or capricious, and was not in violation of any constitutional, statutory or legal principle. *Rynerson v. City of Franklin*, 669 N.E.2d 964, 971 (Ind.1996). The court reviewing an administrative determination may not determine questions of credibility or weigh conflicting evidence and choose that which it sees fit to rely upon in determining whether there was substantial evidence to support an administrative action. *Id.*

*B. Analysis*

The City of Kokomo challenges, as contrary to law, the trial court's conclusion that the demotion must be reversed because Kern was exercising his right of free speech under the First Amendment to the United States Constitution.

 The trial court applied the *Connick/Pickering* test to Kern's speech. *See*

4. Article 3.01 provides: "Department employees shall conduct themselves in a way that reflects most favorably on the Department. Conduct unbecoming a member shall include that which brings the Department into disrepute, or reflects discredit upon the member as a representative of the Department, or that which impairs the operation or efficiency of the Department or its members."

Article 5.09 provides: "All personnel shall keep their supervisors informed of any unusual activity, situation, or problem, with which the Department would be reasonably concerned. These activities may include: Personnel taking drugs on the job, gambling, unsafe working conditions, or illegal activities of any kind."

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (holding that a deputy district attorney's discharge did not offend the First Amendment, after she exercised her rights to speech at the office); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (holding that, absent proof of false statements knowingly or recklessly made, a teacher's exercise of his right to speak on issues of public importance may not form the basis for his discharge). *Pickering* requires determining whether the employee spoke as a citizen on a matter of public concern. *Id.* at 568. If so, the question becomes whether the government employer had an adequate justification for treating the employee differently from any other member of the general public. *Id.* According to *Connick*, a governmental entity has broader discretion to restrict speech when it acts as an employer, but the restrictions imposed must be directed at speech that has some potential to affect its operations. 461 U.S. at 151–52, 103 S.Ct. 1684. "[The Court's] responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state." *Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

■ Recently, the United States Supreme Court again addressed the free speech rights of a public employee, expounding upon the *Connick* and *Pickering* decisions in the context of a § 1983 claim. "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, —— U.S. ——, 126 S.Ct. 1951, 1955, 164 L.Ed.2d 689 (2006) (quoting *Connick*, 461 U.S. at 142, 103 S.Ct. 1684). The plaintiff in *Garcetti* was a deputy prosecutor who was allegedly retaliated against and denied promotion after he wrote a deposition memorandum expressing concerns about an affidavit used to obtain a search warrant. He asserted a § 1983 claim, claiming violations of his First and Fourteenth Amendment rights. *See id.* at 1955–56.

■ The *Garcetti* Court discussed the First Amendment protections afforded public employees, observing that such employees necessarily must accept certain limitations on his or her freedom, but do not surrender all their First Amendment rights by reason of their employment. *Id.* at 1957. Rather, the First Amendment protects a public employee's right, in some circumstances, to speak as a citizen addressing matters of public concern. *Id.* "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* at 1959 (citing *Connick*, 461 U.S. at 147, 103 S.Ct. 1684).

■■ The Court acknowledged that individual and societal interests are served when employees speak as citizens on matters of public concern, yet the government employer must be free to perform important public functions. *Id.* In other words, the employee must retain the right to contribute to the civic discourse, yet the employer must have sufficient discretion to manage its operations. *See id.* Employers have heightened interests in controlling the speech of an employee in his or her professional capacity, in part because "official communications have official consequences, creating a need for substantive consistency and clarity." *Id.* at 1960. Ultimately, the First Amendment does not empower public employees to " 'constitu-

tionalize the employee grievance.'" *Id.* at 1959 (quoting *Connick,* 461 U.S. at 154, 103 S.Ct. 1684).

In *Garcetti,* the Court found the controlling factor to be that "his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 1959–60. More specifically, the Court held, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. The liberty that an employee might have enjoyed as a private citizen is not infringed upon by a restriction on speech that owes its existence to a public employee's professional responsibilities. *Id.* Rather, it is merely an exercise of control over what the employer itself has commissioned or created. *Id.* On the other hand, when an employee, speaking as a private citizen, addresses a matter of public concern, "the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." *Id.* at 1961.

With these principles in mind, we turn to the instant case. The threshold inquiry is whether Kern was speaking as a private citizen on a matter of public concern. If so, he could face only such restriction as necessary for his employer to operate "efficiently and effectively." *Id.* at 1958.

The record indicates that Kern was not making statements pursuant to his official duties as a member of the Fire Department. He signed and submitted, as a member of "the fireworks committee," a letter for publication. Kern also made statements for publication in a newspaper article, opining as a disgruntled citizen that his neighborhood was unnecessarily deprived of a fireworks display and suggesting that updated firetrucks could be obtained in light of a relatively high property tax rate. His speech touched upon matters of public concern, i.e., permit procedures and use of public funds. Accordingly, a balancing of competing interests and consequences ensues, and we must consider whether his speech was restricted beyond that necessary for the efficient and effective operation of the Fire Department.

Kern, as a public employee, retained a right to become involved in public discourse. On the other hand, he was employed as a member of a paramilitary organization with the heightened need for discipline and a greater potential for public harm in the face of dissension in the ranks. Kern implied that he had inside knowledge of improper motivation by a Department official, an implication having great potential for disruption, yet Kern was aware at all times that his application for a private fireworks display was incomplete.

The Board, to whose factual findings we give great deference, found that Kern's statements were "misleading" and "undermined his superior officers in the Department." (App.30–31.) More specifically, the Board found that Kern's statements were misleading to the public because they suggested that the permit application was complete and that Chief Duncan nevertheless refused to grant it because of ulterior motives. Ultimately, the Board concluded that Kern's statements "brought the Department into disrepute" and "interfered with the Kokomo Fire Department's legitimate interests in operating a fire department in an orderly manner and in such a way as to promote the efficiency of the public service it provides." App. 30–31.

The trial court disagreed. Finding of Fact 17 provides:

Contrary to the Findings of the Board, this Court specifically finds that Kern's

statements to the members of the community and the media to be and state matters of public concern. Further, this Court specifically finds that the evidence does not show that the statements brought the Fire Department into disrepute and/or that the statements were proven to have impaired the efficient operation of the Department. This Court finds that Kern's statements were free speech, protected by the First Amendment of the U.S. Constitution.

The City of Kokomo challenges Finding of Fact 17 as an improper substitution of the trial court's judgment for that of the Board.

The evidence before the Board included the testimony of Chief Duncan. When asked to give specifics of the impairment to the efficiency of operations, Chief Duncan responded that "firefighters were not greeted with smiling happy faces" and that people had approached Department members with comments such as "why don't we just grow up and do our job and worry about more important things." (App.78–79.) Chief Duncan also testified to intra-department disruption: "that's all this Department is talking about right now. That's all we get done." (App.110.) Kern admitted in his testimony before the Board that the comments attributed to him were such that "[the Department] would definitely be brought to disrepute." (App. 114.) Accordingly, the evidence before the Board supports its determination that Kern engaged in conduct unbecoming an officer.

The trial court erred in concluding that, despite Kern's dissemination of untruthful statements having the potential to affect the efficient and effective operation of the Fire Department, the First Amendment protected him from employer discipline.

Reversed.

CRONE, J., concurs.

KIRSCH, C.J., dissents with separate opinion.

KIRSCH, Chief Judge, dissenting.

I respectfully dissent.

I agree with my colleagues that Captain Kern's statements were not made pursuant to his official duties and touched upon matters of public concern. I also agree that they have clearly set forth the applicable law. I part ways with them, however, in the application of that law, in the balancing of the competing interests and consequences in this proceeding, and in regard to their conclusion that the restrictions on Captain Kern's speech were necessary for the efficient and effective operation of the Kokomo Fire Department. I believe Captain Kern's comments were protected speech under the First Amendment, and I would affirm the trial court in all respects.

Exposing governmental misconduct and inefficiency is a matter of significant societal importance. Oftentimes, a public employee is the only one having the firsthand knowledge and experience to do so. Restrictions on speech by public employees and reprisals for such speech have a chilling effect on its legitimate exercise. Restrictions on the ability of a public employee to speak as a private citizen on matters of public importance also restrict the public's right of access to meaningful information about its government. Accordingly, such restrictions should be viewed with skepticism.

Deferring to the Board's factual findings, my colleagues hold that Kern's dissemination of untruthful statements had the potential to affect the efficient and effective operation of the Kokomo Fire Department and, thus, are beyond First Amendment protection. Because I do not

believe that the Board's conclusions are supported by evidence of probative value, I do not believe deference should be given to its findings.

It is undisputed that Fire Chief David Duncan interjected the specter of political considerations into the fire works permit approval process. Before Kern ever submitted the permit application, Chief Duncan told Indiana State Representative Ron Herrell, a retired Kokomo Fire Department Inspector, who called to support the issuance of an expedited permit, that he "didn't owe Kern any favors" because Kern had opposed Pat Donohue in the primary election for mayor. *Appellant's App.* at 106. Thus, Captain Kern's complaints that he believed the permit denial was politically motivated have evidentiary support.[5]

Furthermore, the only evidence that Captain Kern's comments brought the Fire Department into disrepute was the testimony of Chief Duncan that "firefighters were not greeted with smiling happy faces" and that unidentified people had approached unidentified Department members with comments such as "why don't we just grow up and do our job and worry about important things." *Appellant's App.* at 78–79. There was no showing that either the lack of "smiling happy faces" or the comments were in any way related to Captain Kern's comments. More importantly, there is no showing that either impaired the operation or the efficiency of the Department in any way. There was no evidence that the response times or outcomes were affected; there was no evidence the safety of firefighters or the public was in any way compromised; and

there was no evidence that any firefighter failed to perform his or her duties at any time.

I would affirm the judgment of the trial court in all respects.

---

**5.** Because the evidence that Chief Duncan interjected political considerations into the permitting process is undisputed, I do not believe the disputed issue of the completeness of the application is material. Moreover, because the Record does not contain evidence of

any other application, granted or denied, we are unable to determine the materiality of the information relating to insurance coverage, fireworks listing and name of fireworks shooter.