**Bradley J. LOVE, Appellant–Plaintiff,**

v.

**Robert REHFUS, Individually and in His Capacity as Fire Chief of the Sugar Creek Township Fire Department, and Sugar Creek Township, Appellees–Defendants.**

No. 30A01–0905–CV–250.

Court of Appeals of Indiana.

Dec. 22, 2009.

**450**

Andrew P. Wirick, Hume Smith Geddes Green & Simmons, LLP Indianapolis, IN, Attorney for Appellant.

Steven C. Jackson, Ferguson & Ferguson Bloomington, IN, Attorney for Appellees.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Plaintiff, Bradley J. Love (Love), appeals the trial court's grant of summary judgment in favor of Appellees–Defendants, Robert Rehfus (Chief Rehfus), individually and in his official capacity as Fire Chief of the Sugar Creek Township Fire Department, and the Sugar Creek Township (the Township) (collectively, Appellees). We reverse and remand for further proceedings.[1]

### ISSUES

Love raises two issues on appeal, which we restate as follows:

(1) Whether the trial court erred by concluding as a matter of law that Love was properly terminated from his position as a volunteer and part-time fireman because his email commenting on the financial situation of the Township's fire department was not protected by the First Amendment to the United States Constitution; and

---

1. We held oral argument in this case on November 3, 2009 at the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank counsel for their excellent advocacy.

(2) Whether the trial court erred by concluding as a matter of law that municipal liability could not be established through the conduct of Chief Rehfus.

*FACTS AND PROCEDURAL HISTORY*

In 2006, Love was an employee of the Sugar Creek Township Fire Department, serving as a volunteer and part-time firefighter. That year, the Township's Trustee, CO. Montgomery (Montgomery), ran for re-election, while being opposed by Bob Boyer (Boyer), who was a volunteer firefighter until his resignation to run for the office of Trustee. The firefighters at the fire department were divided in their support for the respective candidates. Love supported Boyer, whereas Chief Rehfus supported the incumbent.

On April 26, 2006, while off-duty and from his home computer, Love responded to an email he had received from an individual concerned about township land development for parks. Love's response amounted to an email in support of Boyer's candidacy for Trustee in which he discussed certain issues which were the topic of the primary election scheduled for May of 2006. This email, sent to several individuals in the community who were related to the New Palestine Cadet Football League, stated as follows:

> Unfortunately this [the allegation that Boyer intends to sell the township parks] is just not true !!!
>
> I have been on the board of directors for the New Palestine Cadet Football League for 6 years. I have been active in our pursuit of raising funds to help with the parks board. I am pushing for the parks as much as anyone, in fact even more than most.
>
> I have been on the fire dept. here in town since 1994 and have known Bob since then. I asked him face to face if

this rumor is true, and he flat denies it. Bob may be a lot of things, but a liar is not one of them. The sad issue actually is that this rumor has been started by career firefighters that are afraid of loosing [sic] free reigns of the check book. They have stated this and several rumors to take away from the real issues. The fact is that most of these firefighters want to tell us how to vote, but they don't think our community is good enough to live in.

> Bob is not going to lay firefighters off nor cut their benefits either. He will take away unnecessary cars and put people back on shift that should be there anyway.
>
> THE REAL ISSUES ARE:
>
> Our fire dept. expenditures have quadrupled since 1999.
>
> We have 5 new sport utility vehicles that have been purchased in the last 4 years that are given to officers to have free use of. I see them in Castleton, Greenwood and all over the State. We pay for them, gas and insurance. These gas guzzling SUV's are being driven home to Anderson, Greenfield, Franklin Township, and other areas outside of the township every day and YOU pay for it. They do not make emergency runs after 4pm and are just a perk that WE pay for. Large cities like Warren Twp, Lawrence Twp, City of Lawrence, Pike, Perry, and others do not have this many take home cars, and they sure don't give the cars they have to Lieutenants or Captains like we do.
>
> Our Tax Rate is 140% higher than any other Township in the County, that includes Greenfield.
>
> Our current trustee has given himself a 29% pay raise since 1999.
>
> We just took out a $700,000.00 emergency loan to pay for firefighters we hired

that we did not have the money for, nor do we need. We could have put some current personnel back on shift and took away their 7–4 jobs that we don't need to accomplish the same thing. We make 1,300 emergency calls with the same number of people that Greenfield makes over 4,000 calls with. WHY? ? ?

The current administration says that their gross spending habits do not affect tax rate, but where does the money come from to pay for all of this.

I train firefighters all over the State of Indiana and Northern Kentucky and have worked in Ohio, Illinois and Michigan as well. I see everyone and how they do things. This is the worst managed spending I have ever seen in my 9 years of working with 100's of fire depts.

I support Bob because he is a CPA and business man, not a driving instructor. He knows better how to handle funds of a Multi Million Dollar Business.

Who would YOU hire to manage your personal funds, a CPA or a Driving Instructor? ?!!? ?

I ask you support Bob Boyer because he is more qualified for the job and addresses current issues and not made up rumors.

Respectfully,

[Love]

(Appellant's App. pp. 76–77).

On or about May 17, 2006, Chief Rehfus terminated Love. Explaining the reasons for the termination, Chief Rehfus stated in a letter to Love that

Sir:

While it is every person's [sic] right to support and vote for whoever they so choose, it is totally inappropriate to lie about a person or several persons. One of those persons that you lied about was me in an E-mail to the New Palestine Soccer League.

To be specific you stated that I did not make runs after 1600 hours. That would be a lie and you know it.

None of the administration thinks that Sugar Creek Township is good enough for them to live in. That would be lie number two because two of us live in the township. Where is the rule that says you must live in the township in order to work here?

Lie number three is that we have more take home vehicles than any other fire department. You already know that is incorrect, but you will obviously say anything that will embellish your lies.

Effective this date you are terminated from this department for conduct unbecoming a firefighter, and failure to be truthful. Lying about the Chief of the Department is an inexcusable offense.

(Appellant's App. p. 99).

On May 30, 2007, Love filed his Complaint for Damages, Injunctive and Declaratory Relief, and Request for Trial by Jury. On January 23, 2009, Appellees filed their Motion for Summary Judgment alleging that (1) Love's First Amendment Rights were not violated because false statements disseminated to the public are not protected political speech and (2) the theory of *respondeat superior* is not applicable under a § 1983 claim. On April 10, 2009, Love filed his Memorandum in Opposition and Designation of Evidence. On April 27, 2009, the trial court held a hearing on Appellees' Motion for Summary Judgment and the next day, the court entered its Order summarily granting judgment for Appellees and dismissing Love's claims.

Love now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

This cause comes before this court as an appeal from a grant of summary judgment.

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley,* 891 N.E.2d 604, 607 (Ind. Ct.App.2008). Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 607–08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* at 608. The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

## II.  *Freedom of Expression*

Love contends that the trial court erred in concluding as a matter of law that he did not engage in a protected First Amendment activity. His argument focuses on the fact that the content of his email was substantially true and was not damaging to the operation of the Township's fire station. On the other hand, while Appellees do not dispute that Love's email contained political speech and is the reason for his termination, Appellees argue that "recklessly false statements made by a public employee enjoy no First Amendment protection." (Appellees' Br. p. 12).

Love commences the discussion in his appellate brief by quoting at length from *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), standing for the proposition that governmental employees cannot be discharged because of their political affiliation. Here, as also pointed out by Appellees, it is clear that Love was not discharged because he supported the incumbent running for a trustee position; rather the record establishes that Love was terminated because of the content of his email to the football league. Accordingly, *Elrod* and its progeny are inapplicable to the instant cause.

With regard to protected First Amendment speech, it is well settled that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). For many years "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights." *Id.* at 143. That dogma has been qualified in important respects. Our Supreme Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *See, e.g., Pickering v. Bd. of Ed. Of Township High School Dist. 205, Will Cty.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Pickering,* the Court stated that "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the

454

interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

■ *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to speech made by a public employee. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.* If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick,* 461 U.S. at 147, 103 S.Ct. 1684. If the answer is yes, the possibility of a First Amendment claim arises. The question then becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

■ The Supreme Court's overarching objectives in formulating its First Amendment case law are clear. When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. *See, e.g., Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of government services. *Cf. Connick,* 461 U.S. at 143, 103 S.Ct. 1684. At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. So long as employees are speaking as citizens about a matter of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. *Id.* at 147, 103 S.Ct. 1684.

With these principles in mind, we now turn to the instant case.

## A. *A Matter of Public Concern*

■ Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. The *Connick* Court described speech upon matters of public concern as "relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. Here, the parties do not dispute that the content of Love's email addresses a matter of public concern. While Love's email was sent from his private email address and on his private computer, in its content, Love criticizes the efficiency and financial stability of the Township's fire department while openly supporting the incumbent in the upcoming trustee election. He did not make these statements pursuant to his official duties as a member of the fire department, rather he was commenting as a disgruntled citizen on the day-to-day functioning of the local fire department. *See Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Even though Love's email was sent to a limited public and expressed his own private impressions on certain public issues related to the upcoming township trustee election, this characterization does not vitiate the status of the statement as addressing a matter of public concern. *See Givhan v. Western Line Consol. School Dist.* 439 U.S. 410, 414–16, 99 S.Ct. 693, 695–97, 58 L.Ed.2d 619 (1979).

## B. *Balancing of Competing Interests*

■ The main issue in this cause revolves around the "balancing of competing interests" and whether Love's speech was restricted beyond that necessary for the efficient and effective operation of the fire

department. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. While Love, as a public employee, retained a right to become involved in public discourse; on the other hand, he also was employed as a member of a paramilitary organization with a heightened need for discipline and a greater potential for public harm in the face of dissention within its ranks.

Both parties approach this issue from opposite directions. Love bases his argument on *Pickering* and dissects the general impact of his email using the seven factors deemed important by *Pickering*. Conversely, Appellees focus on the false or recklessly false statements they claim were included in Love's email. In this regard, Appellees reference Love's statements concerning the use of the department owned vehicles. While Love stated in his email that the five new vehicles are considered take-home vehicles for the firefighters living outside the Sugar Creek Township and do not make emergency runs after 4 p.m., Appellees point out that Chief Rehfus uses one of these vehicles and frequently makes emergency runs after 4 p.m. In addition to this statement, Appellees also dispute the truthfulness of Love's information regarding the number of emergency calls. Relying mainly on case law from the Seventh Circuit, Appellees now contend that these statements justified Love's termination because false statements do not enjoy First Amendment protection.

The only Indiana case closely related to the facts at hand is *City of Kokomo v. Kern*, 852 N.E.2d 623 (Ind.Ct.App.2006), *trans. denied*. In *Kern*, Kern, a captain firefighter and organizer of a fireworks display in his neighborhood, was instructed by his Chief to obtain a permit for the fireworks display. *Id.* at 625–26. However, privately, the Chief indicated that he hesitated granting Kern an expedited permit because he "didn't owe him any favors" as Kern had opposed a certain individual in the past primary election for mayor. *Id.* at 626. Kern obtained an application for the display and submitted the partially completed application to the Chief. *Id.* The Chief advised Kern that he would not approve an incomplete permit application. *Id.* Consequently, the planned fireworks display was cancelled. *Id.* Thereafter, local newspapers published articles about the cancellation and quoted Kern who alluded to a "personal vendetta." *Id.* Although Kern admitted that he never got a license, he was also quoted as saying "We completed the rest of the process, and the state fire marshall told us there was no reason why our permit couldn't be signed. But the Chief dragged his feet." *Id.* The Chief filed a professional standards complaint against Kern. *Id.* Eventually, Kern was demoted to the rank of firefighter. *Id.* at 627.

In our analysis, we applied the *Connick/Pickering* test to Kern's speech. *Id.* After determining that Kern, a public employee, voiced his statements as a disgruntled citizen and touched upon matters of public concern, we turned to the matter of balancing competing interests. *Id.* at 629. After noting, in passing, the misleading nature of Kern's statements, the *Kern* majority focused exclusively on the effect of Kern's speech on the operational effectiveness of the fire department. *Id.* at 630. Specifically, the majority referred to the Chief's testimony of intra-department disruption and the fact that "firefighters were not greeted with happy faces." *Id.*

Judge Kirsch dissented on the balancing of competing interests test. *Id.* Judge Kirsch pointed out that

> Exposing governmental misconduct and inefficiency is a matter of significant societal importance. Oftentimes, a public employee is the only one having the

firsthand knowledge and experience to do so. Restrictions on speech by public employees and reprisals for such speech have a chilling effect on its legitimate exercise. Restrictions on the ability of a public employee to speak as a private citizen on matters of public importance also restrict the public's right of access to meaningful information about its government. Accordingly, such restrictions should be viewed with skepticism.

*Id.*

Turning to the evidence, Judge Kirsch noted the absence of any evidence connecting the lack of smiling faces to Kern's statements. *Id.* at 731. More importantly, Judge Kirsch stated that there is no showing that the efficiency of the department was impaired. *Id.* Specifically, there was no evidence that the response times or outcomes were affected; there was no evidence the safety of the firefighters or the public was in any way compromised; and there was no evidence that any firefighter failed to perform his or her duties. *Id.*

While the overall facts in *Kern* present similarities to Love's situation, we nevertheless notice some important distinctions. In *Kern*, Kern made a personal attack on the Chief's integrity which was widely publicized by a local newspaper; whereas Love uttered his general disapproval of the effectiveness and the financial stability of the local fire department in a private email to a limited public.

Although the facts are easily distinguishable, the *Kern* court's analysis guides the instant situation. The *Kern* court based its legal scrutiny on United States Supreme Court case law that focuses on the necessity to prove damage. This case law indicates that if no damage is proven, then the statements may be protected even if they are false. In *Pickering*, the Supreme Court expressly declined to adopt a rule directing that knowingly or recklessly false statements are *per se* unprotected. It stated that "we do not deem it appropriate or feasible to attempt to lay down a general standard against which [public employee] statements may be judged." *Pickering*, 391 U.S. at 569, 88 S.Ct. 1731. Although the fact that a statement is recklessly false may well create a presumption that the employee's interest in uttering it is subordinate to the government's interest in suppressing it, the Court has preserved the possibility that such a statement may be protected if it resulted in no actual harm to the employer. *Id.* at 574 n. 6, 88 S.Ct. 1731.

This case law is explicitly followed by our Indiana supreme court. In *Indiana Dept. of Highways v. Dixon*, 541 N.E.2d 877, 882 (Ind.1989), our supreme court quoted extensively to *Pickering*, stating that "In *Pickering*, the Court determined that absent a showing that the statements were knowingly or recklessly false, the mere fact that they were false cannot be the basis of an employer's dismissal. *Even if there were such a showing, absent actual and significant harm, such statements may be protected.*" *Id.* (internal citations omitted; emphasis added). The court concluded that "Dixon's statements are protected even though they may have been false." *Id.*

Here, the parties' briefs do not indicate any specific evidence showing that Love's email caused actual or significant harm to the fire department. However, the designated evidence in the appendix shows that political fliers were posted in the firehouse; and that firefighters supporting Boyer were "shunned. Nobody would talk to them." (Appellant's App. p. 107). Also there were "rumors" that when Boyer's supporters walked "into a room[,] the other employees would walk out, or not speak to them, turn off the TV, things like that." (Appellant's Appendix p. 114). This ten-

sion may have been caused by the contested nature of the election as opposed to Love's email.

Overall, while the specific impact of the speech weighs more heavily in favor of the government entity when paramilitary organizations are involved because of the public safety implications, here, we cannot say that Love's email impacted the operational effectiveness of the fire department. The designated evidence indicating merely a "trace" of impact of Love's email on the fire department is based on rumors and innuendo. There is a complete lack of evidence suggesting intra-department disruption or any other actual or significant harm to the fire department. In absence of any evidenced harm, we do not need to evaluate whether Love's statements were false and recklessly made and whether this warrants the denial of First Amendment protection. As a result, we conclude that the trial court incorrectly applied the facts to the law and we reverse the trial court's grant of summary judgment in favor of Appellees.

## II. *Municipal Liability*

■ As a second issue, Love contends that because the termination decision was made by a policy-maker of the Township fire department, the municipality can be held liable pursuant to *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). On the other hand, Appellees argue that Love's application of *Pembaur* is "partial and flawed." (Appellees' Br. p. 19).

■ It is well established that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). In *Monell,* our supreme court determined that local govern-ment units could be held liable under § 1983 for deprivations of federal rights. However, *Monell* also cautioned that a municipality cannot be made liable by application of the doctrine of *respondeat superior. Id.*

■ The Supreme Court clarified these principles in *Pembaur* by stating that a municipality may be liable only if the deprivation is caused by acts that are, properly speaking, acts of the municipality itself. *Pembaur,* 475 U.S. at 478, 106 S.Ct. 1292. This means that to be the basis for municipal liability under § 1983, tortuous conduct generally must be pursuant to a municipality's official policy made either by the municipality itself or by someone responsible for establishing policy. *Id.* at 478–83, 106 S.Ct. 1292. However, it should be noted that municipal liability attaches only where the decision-maker possesses final authority to establish municipal authority with respect to the action covered. *Id.* at 481, 106 S.Ct. 1292. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *Id.* at 482, 106 S.Ct. 1292. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. *Id.* at 483, 106 S.Ct. 1292.

To elaborate on these principles, the *Pembaur* Court gave the following example:

The County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law en-

forcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Id.* at 483 n. 12, 106 S.Ct. 1292 n. 12.

Turning to the instant case, the designated evidence establishes that Chief Rehfus was responsible for the "overall operation of the department" and was "accountable to the trustee of the township." (Appellant's App. p. 81). Chief Rehfus testified that he did not need approval "from anyone, such as the trustee, to send the termination letter." (Appellant's App. p. 92). This testimony was corroborated during the oral argument when counsel for Appellees elaborated that when an employee is placed on probation, the Township Board of Trustees delegates the final employment decision to the fire department's Chief. Here, at the time of his termination, Love was on probation for matters unrelated to the cause at hand at the time and, as such, Chief Rehfus had final authority to terminate Love. Pursuant to *Pembaur's* holding, Chief Rehfus' decision represented county policy and gave rise to municipal liability. Therefore, we reverse the trial court's grant of summary judgment in favor of Appellees.

*CONCLUSION*

Based on the foregoing, we find that the trial court erred by concluding as a matter of law that Love was properly terminated from his position as a volunteer and part-time fireman because his email commenting on the financial situation of the Township's fire department was not protected by the First Amendment to the United States Constitution. In addition, we find that the trial court erred by concluding as a matter of law that municipal liability could not be established through the conduct of Chief Rehfus.

Reversed and remanded for further proceedings.

FRIEDLANDER, J., and CRONE, J., concur.